Heidi MCCORMICK, Plaintiff,

v.

**KMART DISTRIBUTION CENTER,, et al., Defendants.**

No. 4:00CV1353.

United States District Court,
N.D. Ohio.

May 29, 2001.

---

Samuel F. Bluedorn, Bluedorn, Ohlin & Graham Co., LPA, Warren, OH, Gregory V. Merson, Michelle Pierce Stronezer, Baker & Hostetler, Cleveland, OH, for Kmart Distribution Center.

Raymond J. Tisone, Tisone & Assoc., Warren, OH, for Heidi McCormick.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This matter is before the Court upon the Motion for Summary Judgment on behalf of Defendants, Kmart Corporation ("Kmart") and Sheldon Spiva ("Spiva") (Dkt.# 36). In her Complaint, Plaintiff alleges that she was a victim of both hostile work environment and *quid pro quo* sexual harassment at the hands of Spiva[1], in violation of O.R.C. § 4112 *et seq.* (Counts I and II, respectively). In addition, Plaintiff asserts a violation of Ohio public policy (Count III) and a claim for intentional infliction of emotional distress (Count IV). Subject matter jurisdiction is premised upon 28 U.S.C. § 1332 (1996).

### FACTS

The following facts are not in dispute unless otherwise noted. Plaintiff has been employed by Kmart in the distribution center in Warren, Ohio since March, 1994. Plaintiff has always been a general warehouse associate, although she has worked in different departments and on different shifts. During the relevant time period,

Plaintiff held the specialty position of back order associate and worked the second shift in the repack department.

In March 1994, Plaintiff received a copy of the Kmart Distribution Center Associate Handbook which contains Kmart's policy prohibiting sexual harassment.[2] The policy is also posted near the time clocks at the distribution center. The policy provides a procedure for reporting complaints of sexual harassment: Complaints of sexual harassment or requests for additional information regarding Kmart's policy are to be directed to the Human Resources Manager, Distribution Center General Manager, or Regional Director, Human Resources.

Spiva, who received training regarding Kmart's sexual harassment policy, began working in the repack department in approximately September or October of 1999.[3] Although Defendants dispute whether Spiva was Plaintiff's "supervisor", the parties agree that when employees were finished with their primary duties, Spiva was responsible for assigning to them secondary duties or clean-up assignments in order to complete their shifts.[4] Spiva was one of two employees in charge of monitoring repack assignments.[5]

During the Fall of 1999 and early part of 2000, Craig Griffiths ("Griffiths") was the department manager for repack, and supervised both Spiva and Plaintiff. On

1. Defendants dispute whether Spiva was Plaintiff's "supervisor" as that term is defined by case law interpreting the discrimination statutes.

2. Plaintiff receives periodic updates when the Handbook is amended.

3. Spiva was employed by Kmart Corporation at its distribution center in Warren, Ohio from June 14, 1994 until the end of January

2001 when his position was eliminated due to restructuring.

4. The parties also agree that Spiva never disciplined Plaintiff.

5. Back order associates were rarely reassigned to clean-up chores because they rarely completed the back orders with sufficient time remaining in the shift.

February 14, 2000, Plaintiff told Griffiths that Spiva had asked her "what she would do for him" if he assigned her to a preferred secondary job duty. This was her first complaint to Griffith or any other member of the management team. Following this incident, however, she then recounted daily incidents of what she considered to be sexual harassment by Spiva, dating as far back as December 9, 1999,

Griffiths promptly reported Plaintiff's complaint to Kmart. Griffiths completed and submitted a complaint form after midnight on the morning of February 15, 2000, and Plaintiff completed written complaints on February 16 and 17, 2000.

On February 17, 2000, Corky Dietsch ("Dietsch"), the Human Resources Director at the Distribution Center, told Plaintiff that she had won her bid for third shift in the repack department effective February 20, 2000. However, Plaintiff took an immediate leave of absence, effective February 15, 2000, and did not return to active employment until October 3, 2000.[6]

Kmart launched an investigation regarding Plaintiff's allegations immediately upon receiving Griffiths' signed complaint form. Dietsch conducted the investigation pursuant to Kmart's investigatory procedures. Plaintiff, Spiva, Griffiths, and Jennifer Barker (*nka* Vollhardt) ("Barker") were interviewed and executed written statements during the investigation process.[7] Ultimately, Kmart could only substantiate one incident.[8]

However, based upon the investigation, Kmart concluded that Spiva was overly friendly with associates and issued a written reprimand to Spiva on February 22, 2000. Kmart also transferred Spiva to a second shift assignment outside of the repack department so that he would not have any further contact with Plaintiff.[9] Kmart instructed Spiva that if the series of allegations of sexual harassment had been substantiated, he would have been terminated.

Kmart informed Plaintiff that its investigation was completed, that it could only substantiate the February 14, 2000 comment, and that the conduct would never happen again. Kmart also informed Plaintiff that Spiva had been reassigned to second shift and she would have no further contact with him. Plaintiff admits that after the investigation, she was never approached by Spiva again. (Deposition of Heidi McCormick ("Pl.Dep.") at p. 339.)

*LAW*

FED.R.CIV.P. 56(c) governs summary judgment and provides, in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the evi-

---

**6.** Plaintiff took two weeks of emergency vacation leave effective February 15, 2000. In February 2000, Plaintiff initiated a short-term disability leave which lasted until June 21, 2000. From June 21, 2000 until October 3, 2000, Plaintiff remained on unpaid leave.

**7.** Plaintiff was interviewed regarding her allegations at least twice.

**8.** Spiva's comment on February 14, 2000 was witnessed by Barker.

**9.** Spiva requested to move to third shift but was refused due to the allegations lodged by Plaintiff.

dence submitted must be viewed in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial." *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir.1995). If the moving party meets this burden, then the non-moving party must present additional evidence beyond the pleadings. *See Id.* The non-moving party must present more than a scintilla of evidence in support of his or her position. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be granted unless there is sufficient evidence favoring the non-moving party for a judge or jury to return a verdict for that party. *See Id.* at 249, 106 S.Ct. 2505.

### HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT

R.C. 4112.02(A) makes it an unlawful discriminatory practice "[f]or any employer, because of the *** sex *** of any person, *** to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev.Code Ann. § 4112 (Banks–Baldwin 1999).

■ The Supreme Court of Ohio has determined that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Hampel v. Food Ingredients*

*Specialties*, 89 Ohio St.3d 169, 729 N.E.2d 726, 731 (2000) (*Citing Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (1981)).

In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United States Supreme Court rejected the view that Title VII is unconcerned with purely psychological aspects of the workplace environment and, therefore, prohibits sexual harassment only when it is directly linked to the grant or denial of an economic benefit. Recognizing that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," *Id.* at 64, 106 S.Ct. 2399, the high court explained that a man or woman should not have to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Id.* at 67, 106 S.Ct. 2399.

■ Accordingly, the court held that a plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment. *Id.* at 66, 106 S.Ct. 2399 (1986); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir.) *cert. denied*, 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997). Discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted).

■ In *Harris*, the court further explained:

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris* 510 U.S. at 21–22, 114 S.Ct. 367,

■ However, the conduct need not be psychologically injurious to be actionable. "A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality." *Id.* 510 U.S. at 22, 114 S.Ct. 367.

■ Accordingly, the Supreme Court of Ohio held that a plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of *** sex" by proving either of two types of sexual harassment: (1) "*quid pro quo*" harassment, i.e., harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, i.e., harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment. *Hampel,* 729 N.E.2d at 732 (Ohio 2000) [10].

■ In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Id.* at 732–33.

■ Harassment "because of *** sex" is the *sine qua non* for any sexual harassment case. "But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Hampel,* 729 N.E.2d at 734 (*Quoting Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). The term "sexual," as used to modify harassment, "can refer both to sex as the immutable gender characteristic and to sex as describing a range of behaviors associated

---

**10.** These definitions reflect a shift by the Supreme Court of the United States from the use of the terms "hostile work environment" and "*quid pro quo*" in the employment liability context. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("the labels *quid pro quo* and hostile work environment are not controlling for purposes of establishing employer liability"). Although these constructs are still relevant to the "threshold question whether a plaintiff can prove discrimination in violation of Title VII," *Id.* at 2265, once a plaintiff has established actionable discrimination, the inquiry turns on whether a supervisor's harassment culminated in a "tangible employment action," such as "discharge, demotion, or undesirable reassignment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 808, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

with libidinal gratification." *Id.* (*Citing* 3 Larson, *Employment Discrimination* (2 Ed.2000) 46–34, Section 46.03[4].) Thus, actions that are simply abusive, with no sexual element, can support a claim for sexual harassment if they are directed at an employee because of his or her sex. Simply put, "[h]arassment alleged to be because of sex need not be explicitly sexual in nature." *Hampel,* 729 N.E.2d at 734 (*Quoting Carter v. Chrysler Corp.,* 173 F.3d 693, .701 (8th Cir.1999)).

The Supreme Court of Ohio has adopted the reasoning of the D.C. Circuit, stating:

> We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of the employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual overtones. And we decline to do so now. Rather, we hold that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII.

*Id.* (*Citing McKinney v. Dole,* 765 F.2d 1129, 1138–1139 (C.A.D.C.1985)).

■ Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ The subjective component of establishing a hostile work environment does not require a plaintiff to report incidents establishing a hostile work environment. *See Williams v. General Motors Corp.,* 187

F.3d 553, 566 (6th Cir.1999). Nor does the law require a plaintiff to seek medical or mental health attention in order to establish a hostile work environment claim. "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, [citations omitted], there is no need for it also to be psychologically injurious." *Harris,* 510 U.S. at 22, 114 S.Ct. 367.

"Instead of requiring a plaintiff to establish that his work was actually affected by the harassment, 'the adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance.'" *Williams,* 187 F.3d at 567 (*Quoting Harris,* 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J. *concurring* )).

In order to show this interference, "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job." *Williams,* 187 F.3d at 567 (*Citing Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th Cir. 1988)).

■ Furthermore, the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation. *Id.* at 735 (*Citing Penry v. Fed. Home Loan Bank of Topeka,* 155 F.3d 1257, 1262 (10th Cir.1998)). The court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. *Williams,* 187 F.3d at 562. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Id.* The work environment as a whole must be

considered rather than a focus on individual acts of alleged hostility. *Id.* at 563. Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment. *See Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir.2000). ·

■■■■ Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hampel,* 729 N.E.2d at 735 (*Quoting Harris,* 510 U.S. at 23, 114 S.Ct. 367). The totality-of-the-circumstances standard precludes the kind of analysis that carves the work environment into distinct harassing incidents to be judged each on its own merits. Instead, it is essential that the work environment be viewed as a whole, "keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes." *Id.* at 735–36.

■■■■ Along these same lines, it is generally understood that the "severe or pervasive" requirement does not present two mutually exclusive evidentiary choices, but reflects a unitary concept where deficiencies in the strength of one factor may be made up by the strength in the other. *Id.* at 736. Furthermore, since harassing conduct alleged to be based on sex need not be explicitly sexual in nature, it follows that "[a] plaintiff may also be able to testify to episodes of non-sexual abusive treatment, as well as to sexual conduct, in order to establish the necessary pervasiveness."

*Id.* (*Citing* 3 Larson, supra, at 46–74, Section 46.05[4][b] ).

Ultimately, to determine whether the harassing conduct was "severe or pervasive" enough to affect the conditions of the plaintiff's employment, the Court must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment. *Id.*

■■■■ The Plaintiff states in her deposition that the following incidents occurred between December 9, 1999 and February 14, 2000:

Pg. 222 A: I was at the module and I was talking about my husband's birthday present. [Spiva] had asked me what I got him, and I said, "A cake and a card." And he had said to me, "Well, when it's my birthday, you can get naked and get in bed with me," or something like that. And I said, "What did you say?" And he repeated it back.

Pg. 228 A: When I would be standing at my back order desk, a couple times he came up to feel if I had a bra strap on and—

Pg. 230 A: I'm not sure of a day. I have no way to determine. It would be—every day it was—if it wasn't feeling for a bra strap, it was touching your shoulders, touching your back.

Pg. 233–34 Q: Okay. You said a couple of times for the bra strap incident. And that was—describe how he would touch you.

A: He would take his hand to the back of my back and say, "Do you have a bra on today?" And I would say, "Get out of here." Or "Shut up." You know, those are my answers to

him. Because he was my supervisor and he had told me once that he was the company. And he had not only told me that once, he told me several times he was the company. I was afraid to make formal complaints because I was very much for the union. I was what—they had put me in to help out to organize the union. I had my personal life I was afraid to say anything. And I don't know specific days.

Pg. 238 A: [Spiva] would tell me, "Who are they going to believe?"

Pg. 247 A: He would touch me on several occasions, but it's when nobody was around ... He would touch my neck, my back, my shoulder ... He would take his hands and he would put them either behind my neck—if you would squeeze to grab somebody's neck on the back—he would touch my shoulders. He would take both hands, rub my shoulders. Or else he would take his hand and just rub one shoulder.

Pg. 248–49 Q: I'm asking you in connection with the touching; was he saying anything?

A: He would say—he would ask me all the time "Are you going to get to know me?" Or the one night ... He had told me that we needed to go out and have a drink for me to get to now him better. And I said, "Well, I don't even ever go out. I don't go out to the bars or anything like that." And he would talk about, you know, getting to know me, getting for me to know the real him He had made the comment to me one day, he said—it's just so many different things that were going on. He said, "Once you went black, you never went back."

Pg. 251–52 A: Whenever I would tell him—you know, I would tell him whenever he said it—most of the time it was, "Shut the hell up," or "Leave me the hell alone." It got to the point where it was just absolutely obnoxious. And he had made the comment to me one time where he was a bookie and he had people's legs broken. I don't know, I knew he did gambling, but it's just everybody would—by little things, and it would be to the point where I think he wanted me to be afraid or—

Pg. 253 A: He would say that he was large and—just all the time. And he had said to me, "You know what they say about black men." And I don't even know what they say about black men. I would say to him, "I don't know what the hell you're talking about."

Pg. 254 A: On February 14. I realized that I couldn't take any more. I had tried—on February 14 another job assignment came up. I asked Sheldon, I said, "Can I do that?" And he said, "No." He said, "You have to get to know me better." This time Jennifer Barker was standing there.

Pg. 259 A: He was stating about, you know, getting to know me and it would be—he could use it not just one time. Probably within the time that this happened, on an estimate, I have had to—I had to hear him over probably 30 times saying that he had to get to know me better That's just a rough—if it wasn't more than that.

Pg. 260 A: He would come up to me and say that "Us black people" or "We black people can do this for you white people." And it was always that kind of stuff. . . .

Pg. 261 A: He would say we have large penises. You know, like I said, he would say, "Once you went black you would never go back."

On February 14, 2000, Plaintiff contends that Spiva saw her reporting his alleged sexually harassing conduct to Craig:

Pg. 283–87 A: I looked out, Sheldon was standing there, and I looked at Craig, and I said, "I gotta go do something." I was still in tears. He told me, he said, "Go ahead and go cut." So, I walked upstairs to cut. When I walked outside, Sheldon wasn't at the office door, he was standing there ... I just started cutting ... That's when [Spiva] made the comment to me upstairs. I was on the Low 9, and I heard someone behind me and he let me know my house color ... I heard him behind me, and he told me ... I didn't know who it was. I heard something behind me. I looked back and I didn't see anything until he was right behind me. It was [Spiva] and he asked me my house color. "It's blue, right?" And I said, "No, it's white."

The Court's first inquiry is whether the alleged harassment was "based on sex." The Supreme Court of Ohio in *Hampel* affirmed the Court of Appeals' decision reversing the trial court's finding that the harassment in that case was based on sex, and, therefore, is instructive.

Hampel was working as a cook for FIS–Nestle. His job involved cooking thousands of pounds of meat at a time, using electronically controlled steam injected kettles to produce a blended product. Work was particularly stressful that night, and Hampel became frustrated over not having enough bins for the finished food product, which was an ongoing problem. He went to Hord, his supervisor, to com-plain about the situation, and the following dialogue took place in the presence of Hampel's coworkers:

Hampel: "I'm fed up with the way things are running around here, all this product, and no bins to put it in. One of these days I'm going to blow."

Hord: "Hey, Laz, you can blow me."

Hampel: "What did you say?"

Hord: "I said, you can suck my dick."

Hampel: "I'm frustrated because there are no bins and you tell me to suck your dick? I don't want to think my supervisor is a faggot."

Hord: "But Laz, I only want you to suck my dick. You're the only man in the world that I want to suck my dick. Danny and Ed don't do anything for me."

Hampel: "Man, you're sick."

Coworker: "That is really sick, Jerry."

Hord: "But, Laz, I want you to taste my cum and go, umm, umm, umm, and I want you to wear my pearl necklace."

Hampel: "Man, you're really sick. I'm out of here."

*Hampel*, 729 N.E.2d at 729–29.

At the end of his shift, Hampel went to Hord's office and told Hord that his remarks were degrading, humiliating, and offensive. Hord responded that "if you don't like it, quit." *Id.* at 729.

The Supreme Court of Ohio stated, "While the harasser's words and conduct themselves may sometimes suffice to raise the inference of homosexuality or sexual desire circumstantially, the record in this case points unequivocally to the fact that the expressive function of Hord's language was to mimic rather than reveal any actual sexual desire for Hampel." *Hampel*, 729 N.E.2d at 738.

The Supreme Court of Ohio concluded, "[W]e agree with the court of appeals that

'[t]he evidence in this case points solely to the conclusion that Hord's outburst against [Hampel] was personal and not gender-based.' The same is true of all of Hord's conduct. Hord undoubtedly inflicted serious abuse upon Hampel, not because of his sex, but because he was Hampel."

Unlike the comments in *Hampel,* Spiva's comments to Plaintiff in the case *sub judice* evince "sexual desire" as opposed to "personal animus." Consequently, Plaintiff has produced sufficient evidence to convince a reasonable juror that Spiva's comments were gender based.

The Court must next consider whether the Plaintiff considered her work environment to be hostile. In addition to the deposition testimony already cited, wherein Plaintiff testified that she reacted to Spiva's alleged comments by telling him to "Get out of here" or "Shut up", Plaintiff also testified that she was uncomfortable at work [11]; that she took several days off solely in order to avoid Spiva [12]; that she took her frustration with the situation out at home [13]; and that her anxiety over the situation manifested itself in physical illness.[14] Consequently, Plaintiff has produced sufficient evidence to convince a reasonable juror that her work environment was subjectively hostile.

With respect to the objective component of the Plaintiff's claim, Defendants seek to dismiss Spiva's comments as "[o]ccasional vulgar banter, tinged with sexual innuendo" which are "merely unpleasant", rather than "the type of 'hostile or deeply repugnant' conduct that would offend a reasonable person." Defendants' Motion for Summary Judgment at p. 12. As a matter of fact, the Supreme Court of Ohio has recognized that, "the use of certain vulgar expressions 'has no connection with the sexual acts to which they make reference *** [and] they are simply expressions of [personal] animosity or juvenile provocation,' rather than discrimination based on sex." *Hampel,* 729 N.E.2d at 735 (internal citations omitted.)

While Spiva's inappropriate comments about his body may have been dismissed as "vulgar", those comments, considered in conjunction with his alleged propositions, veiled threat, and physical contact with Plaintiff create "a connection with the sexual acts to which they make reference." Consequently, it is the opinion of this Court that Plaintiff has produced sufficient evidence to convince a reasonable juror that her work environment was objectively hostile.

Having concluded that genuine issues of material fact exist with respect to Plaintiff's hostile work environment sexual

---

11. "[D]ay in and day out I just felt uncomfortable in my department. I did not want to be at work. It made me angry that I had to go to work and have to—I just wanted to go to work and do my job ... I would go home every night feeling terrible ... [E]veryday I went into work I dreaded to clock in because I feared what the day would hold." Pl.dep. at p. 231–32.

12. "I did not want—I couldn't wait to get my new bank of hours just so I didn't have to be there. I believe I called off six days from January 1 to February 14, 2000. I used six personal days." Pl.Dep. at p. 255.

13. "The stress, [my husband and I] didn't have—it was all due to this. We had a lot of stress between us because I was so edgy ... I felt bad for [my husband]. I would take it out on him. I would yell at him all the time and he didn't do anything. Luckily he's a good man and he was able to stand with me and take the moods ... I would take it out on Tim so I didn't take it out on the kids." Pl.dep. at p. 385–86.

14. "I was dealing with everything from December. I was very depressed, I had a lot of anxiety ... I wasn't able to sleep ... I had constant chronic diarrhea." P.Dep. at p. 348.

harassment claim, the Court must determine whether Spiva was Plaintiff's supervisor.

■ In the seminal case of *Genaro v. Central Transport Inc.*, 84 Ohio St.3d 293, 703 N.E.2d 782 (1999), the Supreme Court of Ohio held that "the clear and unambiguous language of R.C. 4112.01(A)(1) and (A)(2), as well as the salutary antidiscrimination purposes of R.C. Chapter 4112, and [the Supreme Court of Ohio]'s pronouncements in cases involving workplace discrimination, [are] all evidence that individual supervisors and managers are accountable for their own discriminatory conduct occurring in the workplace environment." *Id.* at 787.

In order to reach that conclusion, the Supreme Court of Ohio scrutinized the term "employer", as that term is defined by O.R.C. § 4112.01 [15], and compared and contrasted the state discrimination statute's definition of the term with the corresponding Title VII definition.[16] The Supreme Court of Ohio relied upon the rationale that "the differing numerosity requirements and uses of agency terminology indicate that Title VII's definition of 'employer' is far less reaching that the encompassing language of R.C. § 4112.01(A)(2)." *Id.* at 787.

Unfortunately, while the *Genaro* Court established joint and severable liability for supervisor/managers under § 4112, the Supreme Court of Ohio did not define what constitutes a "supervisor" for § 4112, purposes. As a matter of fact, the parties in the case *sub judice* have not produced a single case wherein the term "supervisor" is defined by the Ohio courts. Consequently, as a starting point, this court looks to Title VII case law in order to determine what constitutes a "supervisor" in federal employment discrimination cases.

Although the Supreme Court has never specifically defined the term "supervisor," a definition can be gleaned from the Court's vicarious liability rule for "supervisors" in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)[17]. In *Ellerth,* the United States Supreme Court created vicarious liability for sexual harassment suffered at the hands of a supervisor when the harassment *culminates in a tangible employment action.* The *Ellerth* Court defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257.

The Supreme Court reasoned that "when a supervisor makes a tangible employment decision, there is an assurance the injury could not have been inflicted *absent the agency relationship.*" *Id.* at 761–62, 118 S.Ct. 2257 (Emphasis added). In other words, only a supervisor, or other

---

**15.** "Employer" includes the state, any political subdivision of the state, *any person employing four or more persons* within the state, and *any person acting directly, or indirectly in the interest of the employer.* Ohio Rev.Code Ann. § 4112.01(A)(2) (Banks–Baldwin 1999) (Emphasis added).

**16.** "Employer" is defined as *"a person engaged in an industry affecting commerce who has fifteen or more employees *** and *any*

*agent of such a person."* 42 U.S.C. § 2000e(b) (1998) (Emphasis added).

**17.** The Sixth Circuit has interpreted the term "agent" in Title VII as "an individual who 'serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Wathen v. General Electric Co.,* 115 F.3d 400, 405 (6th Cir.1997) (*Citing Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 803 (6th Cir., 1994)).

822

person acting with the authority of the company, can cause "direct economic harm." *Id.* "A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another." *Id.* at 762, 118 S.Ct. 2257. Therefore, the Supreme Court concluded, "The supervisor has been *empowered by the company* as a distinct class of agent *to make economic decisions* affecting other employees under his or her control." *Ellerth,* 524 U.S. at 762, 118 S.Ct. 2257 (emphasis added).

▇ Consequently, in order to establish that an employee was a "supervisor" under the federal statute, a plaintiff would have to show not only that the employee was vested with the power to make economic decisions affecting the other employees, but that he or she misused that power with a discriminatory motive. Under Title VII, a supervisor who has not misused the power to affect the economic benefits of other employees does not automatically expose his employer to vicarious liability, he or she is treated in the same manner as a co-worker in the *respondeat superior* analysis, that is, the affirmative defense is available to the employer.

In the case *sub judice,* Spiva did not have the power to cause direct economic harm to Plaintiff. Consequently, it is the opinion of this Court that Spiva would not be a classified as a "supervisor/manager" as that term is defined under the federal statute.

However, this case arises under the laws of Ohio. Therefore, the same rationale utilized by the Supreme Court of Ohio in *Genaro, supra.,* for establishing individual liability under § 4112, that is, a broad construction of the term "employer", would

support a more expansive interpretation of that term under § 4112 in order to determine what constitutes a "supervisor."

▇ In Ohio, the state discrimination statute defines "employer" as "any person employing four or more persons within the state", and "any person *acting directly, or indirectly in the interest of the employer.*" Therefore, evidence of supervisory power which has no economic effect on the plaintiff may be considered under the state discrimination statute.

For instance, Plaintiff argues that:

Defendants assert that Spiva did not have the authority to hire, fire, discipline, transfer, or promote employees. (Certificate of Uncontested Facts No. 26). However, it is clear from the record that Spiva did have the authority to assign employees to jobs as the close of their shift. Further, he was evaluated for traits that are typically supervisory traits. Finally, Spiva was written up on June 2, 1998 in a "Supervisor Performance Assessment" with the following: "There will be no tolerance for any supervisor that may look the other way."

Pl.Opp.Br. at p. 15. Plaintiff also emphasizes that Spiva was included in management training with respect to Kmart's sexual harassment policy. *Id.* at pp. 16 and 17.

The fact that Kmart considered Spiva a supervisor is not in and of itself sufficient to establish that he is a "supervisor/manager" for § 4112 purposes. However, his responsibility for disciplining employees and assigning secondary work assignments indicate that he exercised *limited* supervisory authority over Plaintiff.

With respect to *respondeat superior* liability under Title VII, the focus is on the employer. The *Ellerth* Court looked to the authority *given to the employee-supervisor by the employer* in order to deter-

mine the parameters of the employer's liability. Where the employer has given the employee-supervisor the power to affect the economic benefits of the employee-plaintiff, and the employee-supervisor has invoked that authority, no affirmative defense is available to the company.

 With respect to individual liability under § 4112, this Court must take the opposite approach. In order to determine whether Spiva is individually liable under the state discrimination statute, this Court must look to the employer's authority *misused by the employee-supervisor* in order to harass Plaintiff. Therefore, the relevant question becomes, "Did the employee-supervisor misuse the power of the employer in any way to influence or harass the plaintiff?" In the case *sub judice*, the answer to that question is "yes."

Consequently, Spiva's limited supervisory authority considered in conjunction with the fact that he allegedly misused that authority in order to encourage Plaintiff to "get to know him better" and also to discourage her from reporting his alleged misconduct are sufficient to establish that Spiva is a "supervisor" under the broad definition of "employer" under § 4112. Accordingly, it is the opinion of this Court that although Spiva cannot be considered "an agent" of an "employer" under Title VII, he is "a person acting directly or indirectly in the interest of an employer" under § 4112.

Having concluded that Spiva is a "supervisor" as that term is defined by § 4112, the Court must next determine whether Plaintiff can attach *respondeat superior* liability to Kmart. In 1998, *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) invalidated a portion of prior case law in the Sixth Circuit, causing the analytical framework for a hostile-work-environment claim based on a supervisor's actions to be recast. *Williams v. General Motors Corporation,* 187 F.3d 553, 559 (6th Cir.1999).

Previously, to establish such a claim, a plaintiff had to show not only that (1) she was a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; and (4) the harassment created a hostile work environment; but also that (5) the supervisor's harassing actions were foreseeable or fell within his or her scope of employment, and the employer failed to respond adequately and effectively. *See Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 183–184 (6th Cir.1992).

 The Supreme Court summarized the new standard applicable in the case *sub judice* in *Faragher:*

In order to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Burlington Industries, Inc. v. Ellerth, ante,* 524 U.S. at ——, 118 S.Ct. at ——, also decided today. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule.Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b)*

*that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.* While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. *No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. See Burlington Industries,* 524 U.S. at 762, 118 S.Ct. at 2269. *Faragher,* 524 U.S. at 808, 118 S.Ct. 2275 (Emphasis added).

Furthermore, *Faragher* and *Ellerth* signaled a shift from the use of the terms "hostile work environment" and *"quid pro quo"* in the employment liability context. *Ellerth,* 524 U.S. at 765–66, 118 S.Ct. 2257 ("the labels *quid pro quo* and hostile work environment are not controlling for purposes of establishing employer liability"). Although these constructs are still relevant to the "threshold question whether a plaintiff can prove discrimination in violation of Title VII," *Ellerth,* 524 U.S. at 753, 118 S.Ct. 2257, once a plaintiff has established actionable discrimination, the inquiry turns on whether a supervisor's harassment culminated in a "tangible employment action," such as "discharge, demotion, or undesir-

able reassignment." *Faragher,* 524 U.S. at 808, 118 S.Ct. 2275 If a plaintiff can prove a tangible employment action, liability is automatic; if however, there was no tangible employment action, employers have an affirmative defense to liability. *See Faragher,* 524 U.S. at 808, 118 S.Ct. 2275, *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

Plaintiff contends that while the standard articulated by the Supreme Court in *Faragher* and *Ellerth, supra.,* is the proper standard for a hostile work environment sexual harassment claim brought under Title VII, the Supreme Court of Ohio has created a different standard to be applied to the same claim brought under the state discrimination statute. Plaintiff relies upon *Hampel v. Food Ingredients Specialties,* 89 Ohio St.3d 169, 729 N.E.2d 726 (2000), for the proposition that, under the state discrimination statute in Ohio, employers are vicariously liable for hostile work environment sexual harassment created by a supervisor, regardless of whether the harassment culminated in a tangible employment action.

The Supreme Court of Ohio further stated that in order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that *either* (a) the harassment was committed by a supervisor, *or* (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Id.* at 732–33 (Emphasis added).

However, note 2, which is appended to the elements of hostile work environment sexual harassment in *Hampel,* indicates that the Supreme Court of Ohio intended to adopt the *Faragher–Ellerth* standard, rather than create a different standard for state hostile work environment sexual harassment claims.

The trial and appellate courts[18] both relied upon the elements of hostile work environment sexual harassment set forth in *Delaney v. Skyline Lodge Inc.,* 95 Ohio App.3d 264, 642 N.E.2d 395, 399–400 (1994), and it was the lower courts' reliance on the *Delaney* standard that prompted note 2.

Note 2 attempts to reconcile the new standard for hostile work environment sexual harassment articulated by the *Hampel* court with the standard relied upon by the lower courts. Note 2 reads:

> Most courts also require the plaintiff to show that he or she belongs to a protected class, but we find this requirement unnecessary; there are only two sexes and both of them are entitled to protection under R.C. 4112.02(A). *See,* generally, 3 Larson, *Employment Discrimination* (2 Ed.2000) 46–121, Section 46.08[1][b]. As to the first requirement, that the alleged harassment was unwelcome, *see Vinson, supra,* 477 U.S. at 68, 106 S.Ct. at 2406, 91 L.Ed.2d at 60

("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome' "). As to the second and third requirements, they are statutorily mandated. Both the parties and the court of appeals are in general agreement as to these requirements as set forth in *Delaney v. Skyline Lodge, Inc.* (1994), 95 Ohio App.3d 264, 270, 642 N.E.2d 395, 399–400. However, the last requirement listed in *Delaney* is "the existence of *respondeat superior* liability." *Id.* at 270, 642 N.E.2d at 400. Although this description is not necessarily erroneous, the United States Supreme Court has since established vicarious employer liability for unlawful harassment by supervisors, and the federal courts uniformly apply a "known or should have known" test in determining an employer's liability for harassment by nonsupervisory coworkers or nonemployees. *See Faragher v. Boca Raton* (1998), 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Burlington Industries, Inc. v. Ellerth* (1998), 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633; *Shepherd, infra,* 168 F.3d at 1004; 3 Larson, *supra,* at 46–88 to 46–106, Sections 46.07[1] through [4].

*Hampel,* 729 N.E.2d at 733.

In note 2, the *Hampel* court clearly articulates the rationale underlying its de-

---

**18.** Hampel filed suit in Cuyahoga County Court of Common Pleas against his employer and his supervisor, asserting a violation of O.R.C. § 4112, *et seq.,* based upon an alleged hostile work environment sexual harassment created by his supervisor. Hampel also alleged retaliation and intentional infliction of emotional distress. Ultimately, a jury awarded Hampel $368,750 in compensatory damages and $1,280,000 in punitive damages on Hampel's harassment and intentional tort claims.

The Court of Appeals reversed the judgment of the trial court on Hampel's harassment claims finding that there was no evidence to support the conclusion that the supervisor's conduct was "based on sex", and remanded

the cause for a new trial based on the intentional tort claim. Although the Court of Appeals considered the evidence sufficient to support an award of compensatory and punitive damages on Hampel's intentional tort claim, it remanded the cause for a new trial on the issue that it was unable to ascertain for the record whether, and to what extent, the jury would have awarded damages solely for the intentional tort claim. *Hampel,* 729 N.E.2d at 732.

The Supreme Court of Ohio affirmed the Court of Appeals' decision with respect to the hostile work environment sexual harassment claim.

cision to eliminate the Title VII "protected class" element from the § 4112 standard. ("[W]e find this requirement unnecessary; there are only two sexes and both of them are entitled to protection under R.C. § 4112..02(A).")

The same is not true of the *Hampel* court's alleged decision to eliminate the affirmative defense when the claim is based upon harassment by a supervisor. Although Plaintiff contends that the *Hampel* Court cites *Faragher* and *Ellerth* to *distinguish* the requirements of a Title VII from a R.C. § 4112 claim, it is the opinion of this Court that the *Hampel* court cites these cases with the intention of *adopting* the *Faragher/Ellerth* standard.

In an effort to update the state hostile work environment sexual harassment standard set forth in *Delaney, supra.*, the Supreme Court summarized the *Faragher/Ellerth* standard as follows: "[T]he last requirement listed in *Delaney* is 'the existence of *respondeat superior* liability.' Although this description is not necessarily erroneous, the United States Supreme Court has since established vicarious employer liability for unlawful harassment by supervisors, and the federal courts uniformly apply a 'known or should have known' test in determining an employer's liability for harassment by nonsupervisory coworkers or nonemployees." *Hampel,* 729 N.E.2d at 733, n. 2 (internal citations omitted). This statement of federal law is simply incorrect.

In fact, *Faragher* and *Ellerth* created vicarious liability only when a supervisor's harassment culminates in a tangible employment action. Although the *Hampel* court goes on to correctly state the federal rule for non-supervisory employees, that is, that "the federal courts uniformly apply a 'known or should have known' test in determining an employer's liability for harassment by nonsupervisory coworkers

or nonemployees", the *Hampel* court misunderstands that the *same* rule applies to harassment by a supervisor when no tangible employment action occurs.

It is the opinion of this Court that when the Supreme Court of Ohio intends to *eliminate* a Title VII element from the R.C. § 4112 standard, the Court expressly rejects the element and clearly articulates the rationale underlying its decision. However, no such express rejection or intent is evident with respect to the availability of the affirmative defense where sexual harassment by a supervisor does not result in a tangible employment action. Consequently, this Court is convinced that the Supreme Court of Ohio intended to adopt the *Faragher/Ellerth* standard, but failed to do so simply because it misstated the federal standard. Consequently, it is the opinion of this Court that the affirmative defense is available to Kmart in the case *sub judice*.

However, because Plaintiff takes the position that Kmart is vicariously liable under section 4(a) of the *Hampel* test, Plaintiff has not produced any evidence to establish that Kmart, "through its agents or supervisory personnel, knew or should have known of the harassment" prior to February 14, 2000. *See Hampel,* 729 N.E.2d at 732–33. Based upon the deposition testimony, it is the opinion of this Court that there is no evidentiary support for such a claim, and, therefore, Plaintiff cannot, as a matter of law, demonstrate that Kmart should have known about the alleged harassment prior to February 14, 2000. Accordingly, the Court will limit its analysis to Kmart's actions following Plaintiff's February 14, 2000 revelation to Griffiths.

*Ellerth* sets forth the following standard with respect to the affirmative defense:

An employer is subject to vicarious liability to a victimized employee for an

actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

■ It is undisputed that Plaintiff received a copy of the Kmart Distribution Center Associate Handbook, which contains Kmart's policy prohibiting sexual harassment. Furthermore, Plaintiff admits that she did not report Spiva's harassing conduct to management until February 14, 2001. Consequently, it is the opinion of this Court that, prior to February 14, 2000, Plaintiff unreasonably failed to use Kmart's complaint procedure.

Plaintiff argues in her opposition brief that Spiva's statements that, "He is the company", intimidated her and discouraged her from reporting the alleged harassment sooner. Following the February 14, 2000 exchange, Plaintiff states in her deposition:

> I walked away after he said that incident to me. I did not do my job that he told me to go do, slot accumes. I went to Craig. I went straight to the office and I said to Craig, I said, "Craig," I said, "it's been incidents happening where I don't get job assignments."[19] And

---

**19.** Plaintiff testified that she complained about Spiva refusing her preferred secondary job assignments in the past, however she never told Craig about the perceived sexual harassment:

> A: I never came out and told them specifically what had happened. It was a little hint of somebody—I wanted to have somebody reach out and say, "What's actually going on?"
> Q: What kind of hints were you giving them?
> A: I would let them know every night with Sheldon, you know, he denied me of doing a job again.

Pl.Dep. at p. 109

> A: I would go to [Craig] on several occasions when I felt I wasn't—when I was—if I

would ask [Spiva] to do a job, I was told, "You have to get to know me better. We have to get to know each other better." And I went to Craig and said to Craig, "I'm not getting a job again," I couldn't tell him what was going on. I did not discuss this with Craig until February 14. It was—I was trying to reach out and say something, but I didn't know how to actually say it.

Pl.Dep. at p. 214.

> Q: When you would go into Craig's office prior to [February 14], you said you wouldn't tell him that it was related to sexual harassment, you didn't want to put him in that position?
> A: A didn't want—I didn't want it to be all brought out. Like I said, I though that it would either go away or that I would be able to overcome or—that I could handle it.

Craig goes, "Well, if it's the end of the night." I said, "Craig, it's not that." And Craig said, "What is it?" And I said, "Craig, I can't explain it to you." And Craig said, "Why?" I guess it was I didn't feel—I wanted him to ask me why for so long and when he actually looked at me and he said, "What do you feel it is" I couldn't answer him. I wanted someone to say, "What is wrong?" I went to take my hand on the door to turn the knob and I was going to just go do slot accumes, and I broke down. I started crying and he asked me what was wrong. And I had told him the incidents that had happened over the last few months. And he asked me why I didn't come to him. And I said, "Craig," I said, "I didn't even go to my own husband. I haven't told anybody." *And I knew he felt bad because I think Craig—Craig's a very—we always call him, quote, tight shipped. He goes really much by the book. And I feel that he was sincere in him not realizing something was actually going on.* He told me—I don't know how long I was in the office with him, a good 30 minutes probably, if not more. And I was telling him about the incidents.

Pl.Dep. at p. 270–72 (Emphasis added).

This deposition testimony contradicts Plaintiff's alleged concerns about Spiva being "the company." Plaintiff testified not only that Craig Griffiths was considered to be "tight shipped" and "by the book", but that he was genuinely unaware of the harassment prior to February 14, 2001. Her confidence in Griffiths belies any concerns she might have that "Spiva is the company" or that her allegations might not be given the appropriate weight.

Moreover, Kmart immediately launched an investigation, and based upon the substantiation of only one of the many alleged comments, Kmart refused to move Spiva to third shift (Plaintiff's new shift). Ultimately, the fact that Kmart promised that Plaintiff would have no further contact with Spiva, and that, in fact, Plaintiff has had no further contact with Spiva demonstrates that Kmart "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Consequently, while genuine issues of material fact exist as to whether Spiva's comments were "severe and pervasive", Plaintiff's hostile work environment sexual harassment claim against Kmart must be dismissed as a matter of law.

## QUID PRO QUO SEXUAL HARASSMENT

■ To prevail under a sexual harassment claim without showing that the harassment was severe or pervasive [20], the employee must prove the following:

Pl.Dep. at p. 278–79.

**20.** In *Bowman*, the plaintiff claimed that the Supreme Court in *Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), held that no tangible employment action is required to be proved in cases where the harassment is not severe or pervasive (what, according to the Sixth Circuit, used to be referred to as *quid pro quo* sexual harassment) *Bowman*, 220 F.3d at 461. In concluding that the plaintiff's claim was meritless, the Sixth Circuit stated:

In *Ellerth*, the Court explained how the two terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII: When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive. *Id.* at 753–54, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633.

1) that the employee was a member of a protected class;

2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors;

3) that the harassment complained of was on the basis of sex;

4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment [21]; and

5) the existence of *respondeat superior* liability.

*Bowman,* 220 F.3d at 461 (6th Cir.2000) (*Citing Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178, 186 (6th Cir. 1992)).

 Viewing the evidence submitted in the light most favorable to Plaintiff, it is clear that genuine issues of material fact exist with respect to the first three elements of Plaintiff's *quid pro quo* sexual harassment claim.

However, to establish the fourth element, Plaintiff must rely on the fact that, in order to receive her preferred secondary job assignments, she was told by Spiva repeatedly that she would have to "get to know him better." Although these propositions resound in classic *quid pro quo* sexual harassment language, it is the opinion of this Court that the denial of secondary job assignments simply does not establish a tangible job detriment.

For instance, following Hord's outburst in *Hampel,* Hampel was subjected to disparate treatment at the hands of Hord:

Nevertheless, between April 1995 and January 1996, Hord continued to harass Hampel. He constantly watched Hampel, criticized him for minute or minor details, reported him for cleaning errors, and denied him shortcuts in his work that Hord allowed to other employees and previously to Hampel. On slow nights, when other employees would request to leave work early, Hord would grant the request without inspecting their work. However, whenever Hampel made such a request, Hord would "tur[n] everything inside out, looking for anything he could find, and he usually always did. And on many occasions he would make me clean and clean and reclean again." On one occasion, Hord took a white cotton glove to inspect Hampel's cleaning and went around showing the grease on the glove. On another occasion, Hord ran up to Hampel, stood six inches from Hampel's face, and shouted, "you get out of my department right now. I don't ever want to see you again."

*Hampel,* 729 N.E.2d at 729.

In spite of the foregoing incidents, the *Hampel* Court stated that, "The court of appeals correctly observed that, since no tangible employment action was taken in this case, appellant's claim is based on the creation of a hostile working environment." *Id.* at 734. Evidently, the Supreme Court of Ohio found that the foregoing incidents of harassment did not establish a "tangible job detriment."

The same is true in the case *sub judice.* Although Plaintiff states that she was denied preferred secondary job assignments, the nature of such assignment is not sufficient to establish a "tangible job detri-

---

*Bowman,* 220 F.3d at 461 n. 4.

**21.** Courts use the terms "tangible employment detriment" and "materially adverse employment action" interchangeably. *Bowman,* 220 F.3d at 461 n. 5 (*Citing Bryson v. Chicago State Univ.,* 96 F.3d 912, 916 (7th Cir.1996)).

ment." The United States Supreme Court has defined a "tangible employment action" as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257.

Therefore, as Plaintiff's refusal to submit to Spiva's sexual demands did not result in a tangible job detriment, Plaintiff cannot establish the fourth element of her *quid pro quo* sexual harassment claim[22], and, therefore, Count II must be dismissed as a matter of law.

## PUBLIC POLICY

In order to state a claim of wrongful discharge in violation of public policy under Ohio common law, a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a "clear public policy." *Painter v. Graley,* 70 Ohio St.3d 377, 639 N.E.2d 51, Syllabus ¶ 2 (Ohio 1994) (*Affirming and following Greeley v. Miami Valley Maintenance Contractors, Inc.,* 49 Ohio St.3d 228, 551 N.E.2d 981 (1990)). "Clear public policy sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law." *Id.* Syllabus ¶ 2 (*OverrulingTulloh v. Goodyear Atomic Corp.,* 62 Ohio St.3d 541, 584 N.E.2d 729 (Ohio 1992)).

A plaintiff must prove the following four elements in order to prevail on a claim of wrongful discharge in violation of public policy:

(1) a clear public policy existed and was manifested in constitutional, statutory or common law;

(2) dismissal of the plaintiff under the circumstances at issue would jeopardize the public policy;

(3) the plaintiff's dismissal was motivated by conduct related to the public policy; and

(4) the employer lacked an overriding legitimate business justification for the dismissal.

*Courtney v. Landair Transport,* 227 F.3d 559, 565 (*Citing Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653, 657–58 (1995)).

In Ohio, a cause of action may be brought for the tort of wrongful discharge in violation of public policy based on sexual harassment/discrimination in the workplace. *Collins, supra.* In *Collins,* the Supreme Court of Ohio stated that the clarity and jeopardy elements of the tort of wrongful discharge (elements one and two) are questions of law to be determined by the court. *Collins,* 652 N.E.2d at 658. Conversely, the causation and overriding justification elements (elements 3 and 4) are questions of fact for the trier-of-fact. *Id.*

Insofar as Plaintiff was not terminated by Kmart, it is clear that she cannot establish a violation of public policy under Ohio common law. Therefore, Count III must be dismissed as a matter of law.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To establish the intentional infliction of emotional distress in Ohio, a defendant's

---

**22.** Plaintiff concedes that she cannot establish an essential element of her *quid pro quo* hostile work environment claim Pl.'s Opp.Br. at p. 12. ("That is, the harassment by Spiva, while not affecting economic benefits, has the 'purpose of creating a hostile or abusive working environment.' ").

"conduct [must be] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983) (*Quoting* Restatement (Second) of Torts, § 46 (1965)).

 Under Ohio law, in order to establish a claim for intentional infliction of emotional distress, a plaintiff must meet the following standard:

> In order to support a claim for the tort of intentional infliction of emotional distress, four elements must be proved: (a) that the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in severe emotional distress to the plaintiff; (b) that the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community; (c) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and (d) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Bellios v. Victor Balata Belting Co.,* 724 F.Supp. 514, 520 (S.D.Ohio) (*Citing Pyle v. Pyle,* 11 Ohio App.3d 31, 463 N.E.2d 98 (1983), *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666 (1983)).

■ It is the opinion of this Court that genuine issues of material fact exist with respect to whether Spiva's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager, supra.*

## CONCLUSION

Therefore, Defendants' Motion for Summary Judgment is **GRANTED in part** with respect to Plaintiff's *quid pro quo* sexual harassment claims (Count Two) and Ohio public policy claims (Count III), as well as her hostile work environment claim (Count One) and intentional infliction of emotional distress claim (Count Four) against Kmart, and **DENIED in part** with respect to Plaintiff's hostile work environment claim and intentional infliction of emotional distress claim against Spiva.

**IT IS SO ORDERED.**