Yvonne M. BROWNE, Plaintiff,

v.

SIGNAL MOUNTAIN NURSERY, L.P., et al., Defendants.

No. 1:01–CV–351.

United States District Court, E.D. Tennessee, Southern Division.

Sept. 29, 2003.

Rosemarie L. Bryan, Shumacker, Witt, Gaither & Whitaker, PC, Chattanooga, TN, Jimmy F. Rodgers, Jr., Summers & Wyatt, PC, Chattanooga, TN, for plaintiff.

G. Michael Luhowiak, Christine Mabe Scott, J. Robin Rogers, Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, TN, for defendants.

## MEMORANDUM

COLLIER, District Judge.

Following an adverse jury verdict, Plaintiff Yvonne M. Browne ("Plaintiff") filed her Motion For New Trial (Court File No. 137) pursuant to Fed.R.Civ.P. 59. In her motion, Plaintiff identifies a number of grounds as a basis for a new trial. Defendants Signal Mountain Nursery, David

Steele, and Laurel Steele ("Defendants") filed a response (Court File No. 139). Having carefully considered Plaintiff's arguments, Defendants' response, and the applicable facts, the Court, for the following reasons, will **DENY** Plaintiff's motion.

## I. STANDARD OF REVIEW

The standard of review for such a motion is well established. Under Fed. R.Civ.P. 59, a court may set aside a jury verdict and grant a new jury trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R.Civ.P. 59(a). Courts have generally interpreted this language to allow a new trial when a jury has reached a "seriously erroneous result," which may occur when (1) the verdict is against the weight of the evidence; (2) the damages are excessive; or (3) the trial was unfair to the moving party in some fashion (i.e., the proceedings being influenced by prejudice or bias). *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir.1996) (citations omitted). A court exercises its discretion in disposing of a motion for new trial. *See Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996); *Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir.1990) (limiting a court's responsibility to preventing an injustice). The district court's decision is reviewed for an abuse of discretion. *Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir.2000). Reversal is warranted only if the appellate court has "a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)).

Plaintiff relies upon the third prong, *i.e.*, unfair trial, in seeking a new trial on numerous grounds, asserting judicial error caused prejudice to Plaintiff and rendered the trial unfair. In deciding whether to grant a new trial on the basis of prejudice through judicial error, the Court considers each argument under the umbrella of Fed. R.Civ.P. 61:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial ..., unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Plaintiff must therefore show two things in order to justify a new trial on the grounds of judicial error. As a preliminary matter, she must show the Court actually acted erroneously in making a ruling. Then, once error has been established, Plaintiff must show the error prejudiced the proceedings in a substantive way.

## II. RELEVANT FACTS

From the evidence introduced at trial and from the parties' pleadings and memoranda, the Court summarizes the pertinent facts. In August 1999, Plaintiff began working for Defendant Signal Mountain Nursery, L.P. ("SMN"). She initially worked in the sales/perennial department and later was transferred to work with Nabeel Bader ("Bader") in the greenhouse department. Bader was employed as SMN's "grower" and had some expertise regarding the growing of the various plants SMN raised and sold. Although Carol Wetzel was Plaintiff's immediate supervisor, Bader had authority to direct Plaintiff's daily work activities. There was no evidence presented at trial that he had power to make or influence any decisions that would have affected Plaintiff's economic welfare (*i.e.*, a promotion, her pay, etc.) or to take disciplinary action against her. Within the parameters of his duties as "grower," Bader simply had the ability

to assign Plaintiff daily tasks. Bader was not the only person with authority over Plaintiff. She reported to another supervisor and had regular contact with the owners of SMN and others in management positions. On one occasion she even received permission from one of the owners to go home because she was not feeling well.

Plaintiff testified within a few weeks of moving to work with Bader, he began to make comments about how pretty she looked and touched her face. She stated matters soon got worse and Bader began touching her buttocks, rubbing her shoulders, and brushing up against her. He even tried to touch her groin area and then asked her if she liked to be kissed down there. She stated these advances were unwelcome.

On January 19, 2000, Plaintiff told Kim Steele about her problems with Bader. Kim is the daughter of the owners of SMN, David and Laurel Steele, and was acting general manager in January because her parents were on vacation. After meeting with Plaintiff, Kim called her parents. David Steele told Kim to hire an attorney to look into the allegations and also instructed her to give Plaintiff a week off with pay during the investigation. The attorney hired by Defendants interviewed Bader and talked with Kim Steele. On January 31, 2000, David Steele returned from vacation and met with Bader and Plaintiff. In conducting the investigation, Laurel Steele met with several other employees. Some of the employee reports completed as a part of this investigation were admitted into evidence at trial.

On March 14, 2000, Plaintiff was working with Kim Steele potting some flower bulbs.[1] During one of the breaks, Kim discovered a SMN apron that was assigned to Plaintiff. In the pocket of the apron Kim discovered six plant bulbs. Three of the bulbs were crocosmia and three were cyclamens. The bulbs weighed a half pound each. Kim accused Plaintiff of stealing the bulbs. Plaintiff denied she stole the bulbs and said they simply fell into her pocket while she was planting them. David Steele thought Plaintiff was attempting to steal the bulbs and, for that reason, terminated her employment.

Prior to her time at SMN, Plaintiff worked at several other places of employment. At trial some of her previous co-workers and supervisors testified about her flirtatious nature and several incidents where she would engage in bodily contact of a sexual nature at work with either them or male customers at work. The testimony of these prior colleagues was admitted at trial after an *in camera* hearing in which the Court heard the testimony of the various witnesses and argument from counsel as to the admissibility of this evidence under Fed.R.Evid. 412.

At trial, Defendants submitted into evidence Plaintiff's applications for employment at SMN and other jobs. On these applications she was asked to list all prior places of employment. She did not list some of her prior places of employment where she had been involved in flirtatious behavior and had been forced to leave.

After five days of trial, the case was submitted to the jury. The jury returned

---

1. A bulb is a plant object which is defined as "an underground resting stage of a plant(as a lily or an onion) consisting of a short stem base bearing one or more buds enclosed in overlapping leaves: also: a fleshy plant structure (as a tuber) resembling a bulb," Webster's New American Dictionary 67 (1995), or as "a swollen, usually underground, stem hav-ing fleshy scalelike leaves containing stored food for the shoot within." Random House Webster's College Dictionary 179 (1995). The cyclamen bulbs in this case were approximately four to five inches in diameter, two to three inches in height, and had a cake like shape.

a verdict in favor of Defendants and Plaintiff filed the present motion.

## III. DISCUSSION

■ Plaintiff raises several alleged errors she contends warrant a new trial. However, in many instances Plaintiff fails to explain how these alleged errors prejudiced her case in any manner. More importantly, as discussed more fully below, she cannot show how the failure to correct any of these errors would be inconsistent with substantial justice. Most of the issues identified by Plaintiff involve evidentiary rulings or procedural matters over which the Court is accorded a great deal of discretion. See Trepel v. Roadway Express, Inc., 194 F.3d 708, 716 (6th Cir. 1999) (noting all evidentiary rulings are reviewed for "abuse of discretion"). Only one of the alleged errors, an alleged improper jury instruction, raises a substantial legal issue and this alleged error shall be addressed first.

### A. Improper Jury Instruction on the Definition of "Supervisor"

■ A motion for a new trial premised on a challenge to a jury instruction requires the court evaluating the challenge to consider the instructions as a whole, and then determine whether they were misleading or provided an inadequate understanding of the law. Sallier v. Brooks, 343 F.3d 868 (6th Cir.2003); Bowman v. Koch Transfer Co., 862 F.2d 1257, 1263 (6th Cir.1988). Plaintiff challenges the Court's jury instructions relative to the issue of whether Bader was the Plaintiff's coworker or supervisor. The importance of this distinction is not lost on the Court. In a hostile work environment case, the status of the alleged harasser has a determinative impact on the elements the plaintiff must prove and the defenses available to the defendant. See Williams v. Gen. Motors Corp., 187 F.3d 553, 560 (6th Cir.1999). If the harasser is a coworker, the plaintiff must show the defendant, through its supervisory or management level employees, failed to take appropriate and effective action once it had notice of the alleged offensive conduct. Id. at 561. However, if the harasser is a supervisor, the plaintiff need not prove this additional element.[2] Id. Accordingly, whether the alleged harasser was a supervisor or merely a coworker is an important issue in the case.

Plaintiff argues the Court's instructions to the jury were erroneous in that the Court incorrectly defined the term "supervisor"[3] and improperly contemplated the possibility Bader could be considered Plaintiff's coworker.[4] In short, Plaintiff

2. The defendant may still escape liability if the alleged harassment did not result in a tangible employment action and the defense can prove the two elements necessary to establish an affirmative defense. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). However, the defendant bears the burden of proof as to its affirmative defense and the elements can be difficult to meet. Thus, it is of great benefit to defendants for the harasser to be a co-employee rather than a supervisor.

3. The Court's instruction to the jury regarding the definition of "supervisor" was as follows:

A "supervisor" under the law is not a matter of title. Under the law a supervisor is a person with immediate or successively higher authority over the employee and who exercises significant control over the plaintiff's hiring, firing, or conditions of employment. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his control. The essence of supervisory status is the authority to affect terms and conditions of employment, primarily consisting of the power to hire, fire, demote, promote or transfer, or discipline employees.

4. The Court's instruction to the jury was as follows:

For Defendants to be liable, Ms. Browne must prove by a preponderance of the evi-

argues Bader was her supervisor as a matter of law under the proper definition of the term as set forth by the United States Supreme Court and the EEOC. Therefore, any further jury instruction treating Bader as her coworker was erroneous, confusing, and prejudicial. As outlined below, the Court believes its definition of "supervisor" for purposes of Title VII is the proper one in light of the relevant case law and policy considerations.

### 1. *Ellerth and Faragher*

■ The companion Supreme Court cases of *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), provide the starting point for analyzing employer vicarious liability in a Title VII hostile work environment case. Under Title VII, vicarious liability for an employer is automatic if a supervisor engages in sexually harassing conduct that results in a tangible employment action. *Ellerth,* 524 U.S. at 761–63, 118 S.Ct. at 2269; *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2292–93. The reasoning for this result is derived from, but not exclusively controlled by, the traditional principles of agency. *Ellerth,* 524 U.S. at 754–55, 118 S.Ct. at 2265–66. Normally, agency law does not impute an employee's sexual harassment behavior to his or her employer because such actions are considered beyond the scope of the employment. *Id.* at 756–57, 118 S.Ct. at 2266–67. However, even where an employee's actions are outside the scope of employment, traditional agency law may nevertheless hold an employer liable for the intentional tort of an employee if the employee was aided by the agency relationship in the commission of his tort. *Id.* at 760, 118 S.Ct. at

2268. In *Ellerth,* the Supreme Court observed a harassing employee would almost always be aided in his harassment by his agency relationship. *Id.* Indeed, the mere existence of the agency relationship provides the harasser access to the victim and his or her workplace environment in the first instance. Of course, such a broad interpretation of the aided in the agency relation standard would make employers vicariously liable for almost any act by almost any employee. Accordingly, the Court held that something more than the employment relationship itself must exist before the employer would be subject to vicarious liability. *Id.* Regarding what that "something more" would entail, the Court explained:

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation.... The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.
>
> · · · · ·
>
> For these reasons [among others], a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate.

*Id.* at 761–63, 118 S.Ct. at 2269.

■ The Court went on to describe a second class of cases where vicarious liability would apply. Noting a supervisor's power and authority will always invest his or her harassing conduct with a particularly threatening character, the Court held an employer will also be vicariously liable in

dence either (1) Mr. Bader was her coworker, and Defendants' supervisory employees knew or should have known about the al-

leged offensive actions and conduct or (2) Mr. Bader was her supervisor.

situations where a supervisor has created an actionable hostile environment but no tangible employment action is taken. *Id.* at 764–65, 118 S.Ct. at 2270. However, in these cases liability is not automatic, but subject to an affirmative defense. An employer will avoid vicarious liability if it can show by a preponderance of the evidence that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.* at 765, 118 S.Ct. at 2270; *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293. The Court established these rules by looking to principles of agency and the objectives of Title VII, particularly the goals of "encouraging forethought by employers and saving action by objecting employees." *Ellerth,* 524 U.S. at 764, 118 S.Ct. at 2270; *Faragher,* 524 U.S. at 805–06, 118 S.Ct. at 2292.

### 2. *Defining "Supervisor"*

Under either of the two theories of recovery set out in *Ellerth* and *Faragher,* it is the supervisor's ability to exercise authority over the employee that leads to employer vicarious liability. It is less clear, however, how much and what sort of authority are required to qualify an individual as a "supervisor." Although the Court did not specifically define the term, the Court's analysis relied on an understanding of a supervisor as an individual "empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control." *Ellerth,* 524 U.S. at 762, 118 S.Ct. at 2269.

■ The definition of the term "supervisor" for Title VII purposes is a question that has divided the courts. The definition adopted by most courts, and by this Court at trial, considers a supervisor to be a person with immediate or successively higher authority over the employee who exercises significant control over the employee's hiring, firing, or conditions of employment. *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1033 (7th Cir. 1998). *See also Stevens v. United States Postal Serv.,* 2001 WL 1298955 (6th Cir. Aug.7, 2001) (unpublished); *Mikels v. City of Durham,* 183 F.3d 323, 333 (4th Cir. 1999); *Vernarsky v. Covenant Transp., Inc.,* 2003 WL 21212776 (E.D.Tenn. Apr.15, 2003) (unpublished); *Joens v. John Morrell & Co.,* 243 F.Supp.2d 920, 934–35 (N.D.Iowa 2003); *McPherson v. HCA–HealthOne, L.L.C.,* 202 F.Supp.2d 1156, 1168–69 (D.Colo.2002); *Olsen v. H.E.B. Pantry Foods,* 196 F.Supp.2d 436, 439 (E.D.Tex.2002); *Pickett v. Colonel of Spearfish,* 209 F.Supp.2d 999, 1006 (D.S.D. 2001); *McCormick v. Kmart Distrib. Ctr.,* 163 F.Supp.2d 807, 821 (N.D.Ohio 2001); *Anderson v. Dillard's Inc.,* 109 F.Supp.2d 1116, 1124 n. 4 (E.D.Mo.2000); *Jackson v. T & N Van Service,* 86 F.Supp.2d 497, 501 (E.D.Pa.2000). Relying on principles of agency law and a particularized reading of *Ellerth* and *Faragher,* a minority of courts and the EEOC have adopted a broader view defining a supervisor in terms of an individual's power or authority to adversely affect the victim's working environment and otherwise restrict the victim's freedom or ability to respond. *See Mack v. Otis Elevator Co.,* 326 F.3d 116, 126–27 (2d Cir.2003); *Dinkins v. Charoen Pokphand USA, Inc.,* 133 F.Supp.2d 1254, 1265–67 (M.D.Ala.2001); *Grozdanich v. Leisure Hills Health Center, Inc.,* 25 F.Supp.2d 953, 972–73 (D.Minn.1998); *Entrot v. BASF Corp.,* 359 N.J.Super. 162, 819 A.2d 447, 459 (2003). Thus, an individual would qualify as a supervisor if he or she had the power to hire, fire, demote, transfer, discipline, alter compensation, *or* direct the daily work activities of the victim. This is the definition of "supervisor" urged upon the Court by Plaintiff in this case.

In formulating its definition of "supervisor," the United States Court of Appeals for the Seventh Circuit reasoned "because liability is predicated on misuse of supervisory authority, the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor." *Parkins*, 163 F.3d at 1033. Therefore, the Seventh Circuit concluded:

> [I]t is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer.

*Id.* at 1034. The *Parkins* definition of "supervisor" reflects the position of this Court. A supervisor is an employee who has the power to make economic decisions and effect tangible employment actions with respect to subordinates. In addition to being consistent with the Court's interpretation of *Ellerth* and *Faragher*, this definition also conforms with prior Sixth Circuit case law defining an "agent" for Title VII purposes as "an individual who 'serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment.'" *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.1994) (quoting *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993)). *See also Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648–49 (6th Cir.1986) (holding employer strictly liable for harassing conduct of supervisory employees having plenary authority over hiring, advancement, dismissal, and discipline).

### 3. *The Opposing View*

■ Some courts and the EEOC consider an employee to be a supervisor where the employee has actual or apparent authority (1) to undertake or recommend tangible employment actions affecting another employee; *or* (2) to direct another employee's daily work activities. EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (6/18/99), 8 FEP Manual (BNA) 405:7654; *Mack*, 326 F.3d at 127 (finding persuasive and adopting EEOC definition). While courts are not bound by agency interpretations or enforcement guidelines, they are entitled to respect to the extent they are persuasive. *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000). As set out below, the Court does not find the EEOC's position persuasive.

Courts adopting this broader definition of "supervisor" have relied on an understanding of *Ellerth* and *Faragher* that envisions the question of supervisory status turning on "whether the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates." *Mack*, 326 F.3d at 127. Thus, in addition to the power to impact personnel decisions, indicia of supervisory status would also include "any evidence that the alleged harasser controlled the workplace in subtler and [more] indirect ways, as long as the effect was to restrict the victim-employee's freedom to ignore sexually harassing conduct." *Entrot*, 819 A.2d at 459. In short, an employer should be vicariously liable for an employee's abuse of whatever degree of supervisory authority the employer has vested in him or her.[5] *Grozdanich*, 25 F.Supp.2d at 973.

---

5. The Court notes this position, taken explicitly in *Grozdanich* and impliedly in *Mack* and

*Dinkins,* is in direct contradiction of Justice

Application of the *Mack* /EEOC test for supervisory status quickly becomes a subjective and weighty exercise. In addition to considering the exact nature of the grant of authority from the employer to the supervisory employee, a court must also examine the manner in which that authority was communicated, the victim-employee's understanding of and appreciation for it, and any other circumstances which contributed to the victim-employee's inability to resist or ignore the harasser. As an evidentiary matter, a court would have to examine the nature and circumstances of the victim's response to determine whether any agency authority possessed by the harasser actually increased the victim's sense of vulnerability and defenselessness. *See Mikels*, 183 F.3d at 333–34 (assuming, without deciding, employers could be held vicariously liable for actions of employees with lesser forms of supervisory authority, "the victim's response in context may be highly probative on the issue").

The subjective nature of this test is demonstrated by the district court's actual *narrowing* of the definition of "supervisor" in *Dinkins*. There, the court explicitly qualified two elements of the EEOC definition by (1) limiting supervisory status for individuals with authority to recommend tangible employment actions to those whose recommendations are actually "given substantial weight by the final decisionmaker"; and (2) limiting supervisory status for individuals who direct day-to-day work activities to only those who do so "in a manner that may increase the employee's workload or assign additional or undesirable tasks." *Dinkins*, 133 F.Supp.2d at 1266. This degree of hair-splitting is consistent with neither the policies underlying Title VII nor good sense. Such a legal

approach does little to encourage forethought by employers and lends itself to unpredictable results. Moreover, it is not clear how the authority to assign unpleasant work activities, as opposed to desirable ones, operates to enhance a supervisory employee's capacity to sexually harass subordinates or conveys the imprimatur of the employer any more or less forcefully. In any event, none of these distinctions have any bearing on the primary concern of the Court's inquiry, *i.e.*, whether the employee's conduct should be imputed to the employer.

Moreover, the *Mack* /EEOC definition of "supervisor" is inconsistent with the policy rationale underlying Title VII and expressly relied upon by the Supreme Court: encouraging forethought on the part of employers and saving action by employees. *Ellerth*, 524 U.S. at 764, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at 805–06, 118 S.Ct. 2275. The more nebulous the standard for determining which employees are supervisors, the less incentive there is for companies to engage in preventive forethought. For example, the court in *Dinkins* identified eleven individuals who were potentially supervisors. *Dinkins*, 133 F.Supp.2d at 1267 n. 17. The sheer numerosity of potential supervisors under the *Mack* /EEOC rule is directly contrary to the Supreme Court's own understanding of what it was doing in *Ellerth* and *Faragher*. Writing for the majority, Justice Souter rationalized the imposition of vicarious liability, in part, by noting "the employer can guard against their [supervisors'] misbehavior more easily because their numbers are by definition fewer than the numbers of regular employees." *Faragher*, 524 U.S. at 800–01, 118 S.Ct. at 2289–90.

Souter's reasoning in *Faragher:* "Since the virtue of categorical clarity is obvious, it is better to reject reliance on misuse of supervisory authority (without more) as irrelevant to scope-of-employment analysis." *Faragher*, 524 U.S. at 801, 118 S.Ct. at 2290.

Additionally, under the logic of the *Mack* /EEOC approach, vicarious liability should be extended even further to cover any and all employees with any sort of superiority over a plaintiff-employee. If the true determinant of whether or not an individual is a Title VII "supervisor" is the degree to which the harasser's authority enabled or materially augmented his or her ability to create a hostile work environment and/or restricted the victim's ability or freedom to resist, then why should employers not also be responsible for harassment enabled by indirect or informal grants of authority? For example, seniority, history of performance, perceived favor on the part of management, and the existence of personal relationships with superiors can all operate to enable a harasser and restrain a victim's actions in response, even where the harasser is not technically the victim's superior. These informal aspects of agency can be just as powerful as formal authority.

### 4. *Misreading Ellerth and Faragher*

The overly-detailed analysis required under the *Mack* /EEOC definition of "supervisor" merely belies those authorities' mistaken understanding of the premise of the Supreme Court's decisions in *Ellerth* and *Faragher*. In those cases, the Supreme Court was articulating, based on the federal common law of agency, an exception to the general rule that employers are not vicariously liable for the intentional torts of their employees when outside the scope of employment. That exception was not justified by the especially deleterious impact of sexual harassment in the workplace or from superiors nor was its application made dependent upon the degree or invasiveness of the superior's power over the victim-employee. Rather, the premise of the exception was that, in certain situations, a supervisory employee effectively becomes a proxy for the employer so that his intentional torts are no longer solely his own, but also those of the company.

The underlying rationale for imposing vicarious liability on employers is the imprimatur of the company the supervisor's harassing actions carry. Thus, vicarious liability is automatic in cases involving a tangible employment action precisely because such actions "are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Ellerth*, 524 U.S. at 762, 118 S.Ct. at 2269. Thus, "[f]rom the perspective of the employee, the supervisor and the employer merge into a single entity." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992). Even in cases where supervisor harassment does not culminate in tangible employment action, the affirmative defense operates to ensure vicarious liability will not be imposed unless the employer's knowledge, combined with its actions, or lack thereof, are such that the supervisory employee's harassment is impliedly condoned or adopted. It is not enough the harassing employee is "clothed with the employer's authority." *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 77, 106 S.Ct. 2399, 2410, 91 L.Ed.2d 49 (1986) (Marshall, J., concurring). As the Seventh Circuit has noted, "the fact that an employer authorizes one employee to oversee aspects of another employee's job performance does not establish a Title VII supervisory relationship." *Hall v. Bodine Electric Co.*, 276 F.3d 345, 355 (7th Cir.2002). To warrant the imposition of employer vicarious liability the harassment must be reasonably attributable to the employer.

In rejecting the *Parkins* test, the United States Court of Appeals for the Second Circuit reasons a definition of "supervisor" requiring the power to take tangible employment actions (*i.e.*, hire, fire, demote, etc.) is inconsistent with *Ellerth* and *Far-*

*agher* because those cases explicitly contemplate vicarious liability "even for the misbehavior of employees who do *not* take tangible employment actions against their subordinate victims." *Mack,* 326 F.3d at 126 (emphasis in original). Respectfully, this Court believes the Second Circuit misses the point. The two theories of recovery articulated by the Supreme Court in *Ellerth* and *Faragher* were intended to contemplate two different factual situations,[6] not two different classes of supervisory employees. Where no tangible employment action was taken, the defendant-employer may assert an affirmative defense showing the harassing acts were in no way attributable to it; where a tangible employment action was taken, all doubt is removed. The Court did not state this second type of liability would apply to employees having a different amount of control over their co-employees. The difference between automatic liability and liability subject to an affirmative defense appears to be centered on whether the supervisor acted in the first instance or simply had the power to act in the second instance. Therefore, whether a supervisory employee's actions should be attributed to the employer is not a question of whether tangible employment action was taken, but whether the offending employee *had the ability* to effect such actions.

In *Ellerth,* the Court explained the difference between a supervisor and a normal coemployee:

> As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury [*i.e.,* tangible employment action]. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact

with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

*Id.* at 762, 118 S.Ct. at 2269. In other words, what makes a supervisor special is the ability to make economic decisions affecting others.

Some courts have argued a narrow reliance on specific indicia such as the power to hire, fire, and demote will lead employers to attempt to insulate themselves from vicarious liability "by directing all critical personnel decisions to be effected by a personnel department, which may have no direct, and only infrequent contact with the employee subject to the harassment." *Grozdanich,* 25 F.Supp.2d at 973. However, such an argument ignores the fact the *Parkins* test does not require a supervisor have final plenary power to take tangible employment actions, but only the power to recommend, set in motion, or effect such actions. Almost all companies reserve final decisionmaking power in some person or entity other than the immediate supervisor and there is no reason to believe companies will ever be able to eschew the evaluative and administrative processes so completely that personnel decisions are formulated and influenced solely by individuals who have never had any contact with the subject employee.

Advocates of a broad interpretation of the term "supervisor" have also pointed to

---

**6.** *I.e.,* one where a supervisor creates an actionable hostile work environment culminating in a tangible employment action and another where a supervisor creates an actionable hostile work environment but no tangible employment action ensues.

the facts and ruling of *Faragher*. In *Faragher*, a municipal lifeguard sued the city based on alleged harassment by two of her superior lifeguards. The Supreme Court determined both of the alleged harassers were supervisors, specifically noting the lower court's apparently undisputed findings that they held " 'virtually unchecked authority' over their subordinates, 'directly controll[ing] and supervis[ing] all aspects of [Faragher's] day-to-day activities" and that "Faragher and her colleagues were 'completely isolated from the City's higher management." *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275 (quoting *Faragher v. City of Boca Raton*, 111 F.3d 1530, 1544 (11th Cir.1997)). Advocates of the expansive *Mack* /EEOC definition of "supervisor" point to the fact only one of the supervisors in *Faragher* clearly had authority to hire or fire subordinates. The other lifeguard's responsibilities were limited to making daily work assignments and supervising work and fitness training. *Id.* at 781, 118 S.Ct. at 2280. Therefore, they contend, the Court's ruling in *Faragher* expressly contemplates the imposition of supervisor status on employees possessing only the lesser authority to direct daily work activities.

This reading of the *Faragher* decision, however, ignores the holding in the companion case, *Ellerth*, and does not adequately represent the complexity of the facts in *Faragher*. A closer look at the case demonstrates its unique facts do not lend themselves to the establishment of a general rule. Further, one can infer from the unique circumstances in *Faragher* that the individual defendants had effective control over more than just daily work activities.

First, the defendant in *Faragher* was a captain in an organization the Court described as set up in a "paramilitary configuration ... with a clear chain of command" and designations of rank such as "lieutenant" and "captain." *Id.* (citations omitted). A paramilitary structure indicates strict lines of command, rigid discipline, and a formal hierarchy with those of higher rank possessing a great deal of control and authority over subordinates. Although higher ranking officers in such organizations do not typically have the power to hire and fire, they do have considerable power to discipline and exercise control over subordinates. Most employment situations do not involve such a structure. Unlike a fire department or police station, which also have paramilitary structures, the average employer does not have supervisors who can so heavily influence the health and safety of their subordinates.[7] Such power is unusual in corporate America. Thus, the supervisory employees in *Faragher* had special power and authority, much more than simply tangible economic power, over the plaintiff simply based on the unique structure and duties associated with the job.

Second, it should be noted the supervisors in *Faragher* had what the Court described as "virtually unchecked authority" over the plaintiff. *Id.* at 808, 118 S.Ct. at 2293. This is not uncommon in such paramilitary organizations. Other than her alleged supervisors, the *Faragher* plaintiff had no one else to go to with her problems or concerns. She and her colleagues were

---

**7.** For example, the defendant in *Faragher* had the ability to direct Plaintiff's daily activities, which for a lifeguard may entail dangerous activities such as swimming out to save someone who had ventured too close to hazardous rocks in the surf, or going out in dangerous water, or manning a section of beach without any help from other lifeguards. In an example from another paramilitary context, a supervisor in a fire department may have the ability to order a subordinate into a burning building. Such dangerous job duties are not usually a part of the average position in corporate America.

"completely isolated from the City's higher management." *Id.* Thus, one can assume the immediate supervisors in *Faragher* had the ability to effect a tangible employment action against the plaintiff. She had nowhere to go to dispute any critiques her supervisors might have given or any statements they might have made to their own superiors.

These unique circumstances do not provide a fruitful ground from which to draw a general rule. While there may be unique cases where the Court will need to tailor its instructions to fit the power structure of a particular company, the normal corporate environment will be adequately represented by the instruction given by the Court in this case. The Supreme Court has noted there must be some limit on employer responsibility for the creation of a discriminatory or hostile work environment by a supervisor. *See Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408 ("Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible."). Title VII does not make employers "always automatically liable for sexual harassment by their supervisors." *Id. See also Faragher,* 524 U.S. at 804, 118 S.Ct. at 2291. In *Ellerth* and *Faragher,* the Supreme Court drew the line past which vicarious liability would not apply at supervisory employees with the power to determine the terms and conditions of employment. Most courts have recognized this fact and have adopted the instruction given by the Court. *See* O'Malley, Grenig, & Lee,

Federal Jury Practice and Instructions § 171.44—Supervisor (5th ed.2001).

### 5. *Conclusion*

■ In summary, an employee does not qualify as a "supervisor" for purposes of Title VII employer vicarious liability unless he or she is placed by the employer, formally or informally, in a position of superior authority and possesses some significant degree of control over the hiring, firing, demotion, promotion, transfer, or discipline of subordinates. Supervisory status is not a formulaic question of title, but a particularized inquiry into the nature and extent of the authority bestowed upon an employee by an employer. The authority entrusted in a supervisory employee need not be plenary or absolute, but it must encompass, in some significant way, the power to initiate, recommend, or effect tangible employment actions affecting the economic livelihood of the supervisor's subordinates.

Accordingly, Plaintiff has not demonstrated the Court's instruction was in error and this will not form the basis for a new trial. The Court will **DENY** Plaintiff's motion on this ground.

### B. Summary Judgment Ruling

■ Plaintiff first argues it was error for the Court not to rule in her favor in response to Defendants' motion for summary judgment with regard to her retaliatory discharge claim. She does not provide any new authority or additional argument to support her position.[8] Accordingly, the Court will adhere to its

---

**8.** The proper mechanism for objecting to the Court's ruling on a motion for summary judgment would not be a motion for a new trial, but would be a motion to amend or alter judgment pursuant to Fed.R.Civ.P. 59(e). Under that rule the Court may alter or amend its judgment when the moving party can "either clearly establish a manifest error of law or ... present newly discovered evidence." *FDIC. v. World Univ., Inc.,* 978 F.2d 10, 16 (1st Cir.1992) (citations omitted).

earlier ruling and will DENY her motion on this ground.

## C.   Time Limits on Voir Dire

Plaintiff contends it was error for the Court to limit her time for voir dire when she had previously been told by the Court on several occasions there were no time limits on voir dire as long as matters were kept within reason and relevance.  In general, the Court believes counsel should be afforded considerable leeway in presenting their cases.  Only rarely does the Court set strict time limits on voir dire prior to trial.  But obviously such leniency is susceptible to abuse.  In instances where it becomes obvious to the Court counsel has exhausted all reasonable avenues of inquiry and has become repetitious or ineffective, the Court will instruct counsel to bring his voir dire to a conclusion within a specific time.  As the Court recalls, the Court informed counsel he had five additional minutes to ask germane or reasonable questions.  At that point, Plaintiff was not making a great deal of progress in her voir dire and had exhausted all of her reasonable lines of inquiry.  At the point the Court gave this limit, Plaintiff had already spent a considerable time questioning the panel on topics as wide ranging as what college football team they supported to whether they had heard the song "Que Sera Sera" from the 1956 Doris Day movie "The Man Who Knew Too Much." [9] See www.dorisday.net.

■ Without the ability to exercise some control over voir dire, this initial part of the trial could go on indefinitely.  For this reason, trial courts have broad discretion concerning the scope of questioning during voir dire, *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 1689 n. 12, 90 L.Ed.2d 27 (1986), and may limit the time of such questioning.  *Ratliff v. Schiber Truck Co., Inc.,* 150 F.3d 949, 955 (8th

Cir.1998).  The Court does not believe it abused that discretion in limiting Plaintiff to five more minutes after what the Court remembers was more than thirty minutes of questioning.

■ Even if the Court had erred in limiting Plaintiff's questioning of the jury panel, she has done nothing to show how this substantially prejudiced her case or her ability to intelligently question and challenge possible jurors.  *See United States v. Johnson,* 584 F.2d 148 (6th Cir. 1978) (holding the basic function of voir dire is to allow for the empanelling of a fair and impartial jury through questioning that permits the intelligent exercise of challenges by counsel).  Plaintiff has failed to provide the Court with any questions she was not allowed to ask or explained how such questions would have affected the case.  Accordingly, the Court concludes this alleged error cannot form the basis for a new trial and will DENY her motion on this ground.

## D.   *Batson* Challenge

Plaintiff argues the Court erred in allowing Defendants to exercise a peremptory challenge to strike the only African American venire person on the venire panel.  She argues Defendants were never required to give any rational basis for the strike and speculates they would be unable to do so given the fact the venire person was quiet and non-responsive throughout voir dire.  Accordingly, she argues she is entitled to a new trial under the Fourteenth Amendment of the Constitution of the United States because one of the venire persons was struck based upon race.

■ In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held a litigant's constitutional right to equal protection in-

---

9.  The film also starred Jimmy Stewart and        was directed by Alfred Hitchcock.

cludes assurance a party may not exercise a peremptory challenge to remove an individual on account of that person's race. This protection has been extended to civil trials and even to situations where the party asserting an equal protection challenge is not a member of the improperly excluded juror's race. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). In order to establish an equal protection challenge under *Batson*, a party is required to establish a *prima facie* case. *United States v. Mahan*, 190 F.3d 416 (6th Cir.1999). If it meets that burden, the other party is required to proffer a race-neutral explanation for its decision. *Id.* Finally, the party asserting the challenge must demonstrate the other party's explanation was merely a pretext for a racial motivation. *McCurdy*, 240 F.3d at 521.

Following voir dire but before the jury was sworn, Plaintiff mentioned she was concerned the only African American on the venire was struck, but did not state what relief she requested. The Court repeatedly asked Plaintiff what she would like the Court to do and she did not answer one way or the other, but simply stated she would leave it in the hands of the Court. When asked if she was raising a *Batson* challenge, Plaintiff was non-responsive. The Court did not pursue the matter because Plaintiff did not state what relief she sought and the Court is not in the habit of divining the wishes of parties. Therefore, Defendants were never afforded the opportunity to proffer a race-neutral explanation and the Court did not err in its failure to take action that was never requested by Plaintiff.

Even if the Court had erred, Plaintiff has not explained how this injured her case. This case concerned sexual harassment and race was not an issue.

Inasmuch as race could be argued to have arisen in the case it would be to Plaintiff's benefit to have minorities struck from the jury. Plaintiff is white and her alleged harasser is of Middle Eastern descent. Thus, if any racial issue did enter the case, one would expect minorities to have more sympathy to an individual who may have been perceived as a member of a racial minority. Accordingly, this "error" does not warrant a new trial and the Court will DENY Plaintiff's motion on this ground.

## E. Failure to Rule on Plaintiff's Motion for Judgment

Plaintiff argues the Court's failure to rule on her motion for judgment with regard to Defendants David and Laurel Steele prejudiced her case because the jury was confused over the exposure those defendants had if she won her case. Plaintiff filed a motion for judgment requesting the Court to enter judgment as to Defendants David and Laurel Steele (Court File No. 99). In the motion Plaintiff argued these Defendants had already admitted in previous pleadings they were the only owners of Defendant SMN and thus under Tennessee law they would be personally liable for any judgment SMN would be unable to pay.

This issue was not one for the jury to consider and would not have any relevance until a jury award was entered in Plaintiff's favor. Therefore, the Court did not deem it proper to rule on the motion before the return of the verdict in this case. Plaintiff has not addressed this concern in her motion.

Plaintiff also argues the failure of the Court to rule on this issue confused the jury and allowed them to have sympathy for Defendants David and Laurel Steele [10]

10. This argument is particularly curious after Plaintiff spent so much time and effort fight-

ing to have the Steeles added to this case.

because it was not made clear to the jury these defendants were not jointly and severally liable with SMN. As the Court explained to Plaintiff at the jury charge conference, jurors are unlikely to be able to understand the difference between joint and several liability and partnership liability after exhaustion of the partnerships assets. Rather than confuse the jury, the Court omitted such a discussion. However, the Court did include on the verdict form that David and Laurel Steele were only being sued in their official capacities as general partners of SMN. The Court believes this was sufficient to allay Plaintiff's fears.

Moreover, even if David and Laurel Steele had not been named as parties, at least one of them would have had the right to sit at the defense table. They still would have been present in the courtroom.

Lastly, the Court instructed the jury not to be guided by any sympathy to anyone in reaching its verdict. Plaintiff has failed to show why the jury would have felt any sympathy for David and Laurel Steele as opposed to Plaintiff or anyone else in the case.

Even if the Court erred in this regard, such error did not result in substantial prejudice to Plaintiff. Any sympathy jurors may have had toward Defendants David and Laurel Steele did not rise to the level of affecting substantial justice. The Court will **DENY** Plaintiff's motion on this ground.

### F. Failure to Allow Leading Questions

■ Plaintiff argues her inability to ask leading questions on direct examination of several hostile witnesses was error. While Plaintiff lists five of her eight witnesses, the Court can only remember one instance where the issue arose at trial. That witness, Meg Walker, was an employee of SMN. After Defendant raised the objection to leading this witness, the Court asked Plaintiff if he could try to continue the examination without leading. Plaintiff continued the examination and did not appear to have difficulty eliciting information. She has not identified what information she was unable to obtain from her examination of this witness or any other witness she lists as being unable to lead. Meg Walker did not act in a hostile manner and answered all of Plaintiff's questions without difficulty. It is obviously more effective for a party if a witness gives answers in their own words rather than in the form of a simple "yes" or "no." Rather than being prejudiced by Walker's testimony in her own words, Plaintiff was helped. Without any prejudice to her case, this "error" cannot form the basis for a new trial.

Further, the Court does not believe it was in error to instruct Plaintiff not to lead Walker. Pursuant to Fed.R.Evid 611, when a party "calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation *may* be by leading questions." Fed.R.Evid. 611(c) (emphasis added). As the language of the rule suggests, leading in this circumstance is discretionary. *See also Gates v. City of Memphis*, 210 F.3d 371, 2000 WL 377343 *2 (6th Cir. April 6, 2000) (unpublished) (citing Weinstein's Federal Evidence, 2d ed. § 611.06[3], at 611–64 Vol 4 (1999) for the proposition that a district court is not required to allow counsel to ask leading questions of an adverse witness). Because it was unclear at the time whether Walker was, in fact, a hostile witness, the Court chose to admonish Plaintiff to try and stay away from leading questions. Walker's subsequent testimony and behavior on the stand belied any concern she was hostile to Plaintiff or Plaintiff's case. Thus, Plaintiff has failed to demonstrate how such a decision was erroneous under the rule or rele-

vant authority and the Court will **DENY** her motion on this ground.

### G. Timing of Fed.R.Evid. 412 Hearing

██ Plaintiff argues she is entitled to a new trial because the Court did not hold a hearing on Defendants' motion pursuant to Fed.R.Evid. 412 until after the commencement of trial. She contends the delay in holding the hearing prevented her from adequately preparing for trial and was in violation of the rule.

Pursuant to Fed.R.Evid. 412, evidence offered to prove an alleged victim engaged in sexual behavior or to prove the victim's sexual predisposition is generally not admissible. Fed.R.Evid. 412(a). However,

in a civil case, evidence offered to prove sexual behavior or sexual predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party.

Fed.R.Evid. 412(b)(2).

Rule 412 also contains specific provisions as to the procedures the Court is to follow in ruling on the admissibility of this type of evidence. First, the party intending to offer the evidence must file a written motion at least fourteen days before trial describing the evidence it seeks to introduce. Fed.R.Evid. 412(c)(1)(a). Defendants met this requirement (*See* Court File No. 113). Next, the Court must conduct an *in camera* hearing and "afford the victim and the parties a right to attend and be heard." Fed.R.Evid. 412(c)(2). The rule is silent on when this hearing is to occur. In this case, the Court held the hearing after the trial had already started. Even in cases where the required Rule 412 hearing was not held at all, the Sixth Circuit has declined to hold that a plaintiff is entitled to a new trial. *See Myer–Dupuis v. Thompson Newspapers, Inc.,* 1997 WL 809955 (6th Cir. Dec.19, 1997) (unpublished).

Plaintiff's other concern that the delay in holding the hearing prevented her from presenting her case is also without merit. The one case cited by Plaintiff to support her position involved a court that did not admit Rule 412 evidence because neither party provided the court with a detailed enough description of the evidence in dispute and the court did not hold a Rule 412 hearing even after the trial began. *See Socks–Brunot v. Hirschvogel, Inc.,* 184 F.R.D. 113, 120 (S.D.Ohio 1999). In the present case, Defendants submitted detailed explanations of the witnesses and their likely testimony that would be covered by Rule 412, fourteen days before trial. She had ample time to prepare for the hearing and if she felt prejudiced, she could have asked for a continuance. Further, the Court conducted a Rule 412 hearing in this case where extensive evidence was presented to the Court and the parties had ample opportunity to raise arguments concerning that evidence. This ground for a new trial is without merit and the Court will DENY Plaintiff's motion on this ground.

### H. Fed.R.Evid. 412 Evidence Should Not Have Been Admitted

██ Plaintiff also argues the Court erred in its decision to allow the admission of the evidence Defendants introduced pursuant to Fed.R.Evid. 412.[11] Defendants sought the admission of the testimony of several witnesses who worked with Plaintiff in her former places of employment and at SMN. Plaintiff argued regard-

---

**11.** After conducting a hearing on this issue, the Court allowed certain evidence to be ad- mitted and disallowed certain other evidence.

less of what happened in these prior work place settings, such information would be irrelevant to the issues in this case because the witnesses could not state what happened at SMN between her and the alleged harasser, Bader.

Several courts have held public sexual behavior the plaintiff engaged in while at work would be relevant to her sexual harassment claim. *See Beard v. Flying J, Inc.*, 266 F.3d 792, 801 (8th Cir.2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), for the proposition evidence of workplace behavior is highly relevant to the question of whether the alleged harassment was welcome); *Myer–Dupis v. Thomson Newspapers, Inc.*, 134 F.3d 371, 1997 WL 809955 (6th Cir. Dec.19, 1997) (unpublished) (affirming district court that admitted public actions of the plaintiff at work, but excluded other evidence about the plaintiff's private sexual acts). The holdings in these cases are based on the idea that how a person behaves in the work place is probative of how she perceives certain public behavior, while private behavior is irrelevant to such a determination. *See Meritor*, 477 U.S. at 69, 106 S.Ct. 2399 (holding "publicly expressed" fantasies would be relevant without limiting the relevance of such evidence based on where it occurred in public).

The evidence offered by Plaintiff's prior colleagues was probative of how she acts and what she feels is appropriate in public, specifically a work place environment. The fact her actions did not occur at the particular work environment where the alleged harassment occurred or between her and the alleged accuser does not diminish the relevance of those actions in this case. To the extent any of this evidence was prejudicial, the Court was soundly within its discretion in balancing prejudice and probativity. *United States v. Feinman*, 930 F.2d 495, 499 (6th Cir.1991) (holding

high degree of deference is afforded trial court's Rule 403 determination). Under the abuse of discretion standard, the appellate court takes a "maximal view" of the evidence's probative effect and a "minimal view of its unfairly prejudicial effect." *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir.1993); *United States v. Sassanelli*, 118 F.3d 495, 498 (6th Cir.1997). One of the important issues in the case was whether Plaintiff subjectively perceived the actions of Bader to be harassment so severe and pervasive as to change the conditions of her employment. How Plaintiff acted with regard to sex in an employment setting certainly was probative of what she subjectively believed to be harassment. There was testimony from some witnesses Plaintiff initiated inappropriate action with Bader and she welcomed certain other actions from Bader. Thus, it was not error for the Court to admit this type of evidence and the Court will **DENY** Plaintiff's motion on this ground.

## I. Evidence Concerning Employment Applications

█ Plaintiff argues it was error for the Court to admit evidence concerning her employment applications because her retaliation claim had already been dismissed prior to trial. She argues the only reason the employment applications would have been relevant is because they would have gone to the issue of the amount of damages she was entitled to after she was discharged. As that issue was no longer in the case, the applications were irrelevant.

This argument ignores the fact Plaintiff's credibility was at issue in the case. Her claims depended upon the truthfulness of her testimony. The inaccurate information on her employment applications was relevant to the issue of her credibility and therefore was properly admitted.

*See Feinman,* 930 F.2d at 499 (holding district court balancing under Rule 403 is reviewed for abuse of discretion). This ground is wholly without merit and the Court will **DENY** Plaintiff's motion on this ground.

### J. Evidence Concerning Plaintiff's Alleged Theft from SMN

■ Plaintiff contends the Court erred when it admitted evidence concerning her theft of flower bulbs from SMN. Again, Plaintiff argues the issue was not relevant after she had dismissed her retaliation claim. She contends the alleged theft was the reason offered by SMN for her termination, but as her retaliation claim was no longer part of the trial, the events surrounding that theft were also not relevant.

At trial, the Court agreed with Plaintiff and limited Defendants' evidence to the conflicting statements Plaintiff may have made and the credibility of her explanations. The Court specifically prohibited any mention of a possible theft. As noted previously, the credibility of Plaintiff was a central issue in the case. It was not until Plaintiff began to offer additional explanations for her actions that she opened the door for Defendants to present further details surrounding the incident. Once Plaintiff opened the door to the type of questions Defendants asked, the Court could not close it.

Accordingly, the Court did not abuse its discretion in admitting evidence of the alleged theft. *Trepel v. Roadway Express, Inc.,* 194 F.3d 708, 716 (6th Cir.1999) ("all evidentiary rulings are reviewed for 'abuse of discretion' "). Even if the Court had erred, such error did not affect Plaintiff's substantial rights and does not warrant a new trial. The Court will **DENY** Plaintiff's motion on this ground.

### K. Statements of Witnesses

■ Plaintiff argues the Court should not have admitted the written statements of certain employees of SMN. She claims these statements were hearsay and she was unable to cross-examine these witnesses because their statements were admitted as documents. A court's hearsay evidentiary rulings are reviewed for an abuse of discretion. *Trepel,* 194 F.3d at 716.

The statements Plaintiff refers to were created by employees of SMN as part of an investigation conducted by David and Laurel Steele into the sexual harassment allegations made by Plaintiff. They were admitted not to prove the truth of the matters asserted within them, but to show what information the Steeles had before them during the investigation and to explain why they took the actions they did. How the Steeles investigated Plaintiff's complaint and whether that investigation was reasonable were issues in the case. Throughout the case, Plaintiff argued the Steeles had conducted an inadequate and incomplete investigation. The Court instructed the jury they were being admitted with regard to this limited purpose. As the statements were not offered for the truth of the matter asserted, they were not hearsay and were properly admitted. *See* Fed.R.Evid. 801(c). Accordingly, the Court will **DENY** Plaintiff's motion on this ground.

### IV. CONCLUSION

For the reasons listed above, the Court will **DENY** Plaintiff's motion for a new trial.

An Order shall enter.

### ORDER

In accordance with the accompanying Memorandum, the Court **DENIES** Plain-

tiff Yvonne M. Browne's Motion for New Trial (Court File No. 137).

**SO ORDERED.**